Patrick **CARMICHAEL**, et al., Plaintiffs,

v.

**SAMYANG TIRES, INC.,**
et al., Defendants.

Civil No. 93–0860–CB–S.

United States District Court,
S.D. Alabama,
Southern Division.

April 1, 1996.

**1516**

Richard H. Taylor, Steven A. Martino, Sidney W. Jackson, III, Steven A. Martino, Mobile, AL, for plaintiffs.

C. Richard Wilkins, Mobile, AL, for Carina Horn.

Warren C. Herlong, Jr., Joseph P.H. Babington, Mobile, AL, for defendants.

Steven A. Martino, Liason·Counsel for the Plaintiffs, Jackson, Taylor & Martino, Mobile, AL, for Leona Carmichael, Shameela Carmichael, Natimah Carmichael.

## ORDER

BUTLER, Chief Judge.

This matter is before the Court on a motion for summary judgment filed by all defendants (tab 117); motion for summary judgment filed by defendants Kumho U.S.A., Inc. ("Kumho U.S.A.") and Hercules Tire & Rubber Co., Inc. ("Hercules") (tab 115); and motion of all defendants to exclude testimony of plaintiff's expert Dennis Carlson (tab 119). After careful consideration of the issues raised by the parties in their briefs, the Court finds that the defendants' motion for summary judgment is due to be **GRANTED**.

### I. Factual Background

The underlying facts of this products liability action are largely undisputed by the parties. On July 6, 1993, a 1988 Ford Aerostar XL minivan owned and driven by plaintiff Patrick J. Carmichael was involved in a single-vehicle accident while traveling southbound on Interstate 65 in Baldwin County, Alabama. The accident occurred when the right rear tire of the van failed, after which the driver lost control of the vehicle. The van overturned, and six of the eight occupants were ejected from the van. Plaintiffs Patrick Carmichael, Luzviminda Carmichael, Carina Horn, Patrick Carmichael, Jr., Leona Carmichael, Shameela Carmichael, and Natimah Carmichael all suffered injuries as a result of the accident. Janice Horn, the daughter of plaintiff Luzviminda Carmichael, died as a result of her injuries.[1]

This lawsuit revolves around the history of the Carmichaels' minivan and, more precisely, of the right rear tire which was on the minivan at the time of the accident. On April 30, 1993, plaintiff Patrick Carmichael purchased the minivan "as is" from a Dodge dealership in Washington state. At the time of the sale, the van's odometer registered 88,997 miles. The right rear tire on the van at the time of Carmichael's purchase was a

---

1. There is a dispute as to whether the plaintiffs were wearing seatbelts at the time of the accident, and whether the wearing of seatbelts would have prevented the accident. Additionally, the parties disagree as to whether Patrick Carmichael's reaction to the blowout contributed to the accident, and whether there are actions he could have taken which would have prevented the acci-

dent. The speed of the minivan prior to the accident and the causal relationship, if any, between that speed and the plaintiffs' injuries are likewise matters on which the parties advance conflicting positions. For the purposes of this summary judgment motion, these factual disagreements are resolved in the light most favorable to the plaintiffs.

Hercules Superior XII Steel Belted Radial, the same tire that failed two months and 7,011 miles later.[2] This tire was designed and manufactured by defendant Kumho & Company ("Kumho") and was produced in the Republic of South Korea in the sixth week of 1988.[3] Though the service history of the tire is unknown, a plaintiffs' witness has stated his opinion that the tire had been driven for thousands of miles prior to failure. The witness further testified that the remaining tread depth on the tire at the time of the accident varied from 0/32″ to 3/32″, down from an original depth of 10/32″ to 11/32″. Additionally, the tire had been punctured by a nail or screw at some point during its service life, and the plaintiffs' witness testified that the exterior holes caused by the puncture had not been adequately filled.

The tire was stamped with the name "Hercules" before it left the factory in South Korea. It is undisputed that defendant Hercules Tire & Rubber Company, Inc. ("Hercules") did not manufacture or design the tire, although it did retain the right to approve the aesthetics of the lettering, markings, and tread on the tire. Hercules is in the business of buying and distributing tires produced by others. Defendant Kumho U.S.A., Inc. ("Kumho U.S.A."), a separate entity from Kumho, did not participate in either the manufacture or the design of the tire at issue. Kumho U.S.A. is in the business of distributing Kumho's products in the United States. Prior to 1990, Kumho shipped the Hercules tires it produced to one of three recipients: (1) to Kumho U.S.A.; (2) to Hercules; or (3) directly to the customer who was purchasing the tires. The plaintiffs have been able to produce no evidence as to which distribution route was used with respect to the particular tire at issue in this case; hence, there is no evidence that defendants Hercules and Kumho U.S.A. ever handled or sold this tire.

On October 20, 1993, the plaintiffs filed the instant lawsuit in this Court, sitting in diversity jurisdiction. As amended, the complaint sets forth causes of action against the defendants under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), negligence/wantonness, and breach of warranty. Plaintiffs have retained one expert witness, Dennis Carlson ("Carlson"), to testify as to the presence of a manufacturing or design defect in the right rear tire of the minivan. The defendants have filed two summary judgment motions, as well as a motion to exclude Carlson's testimony under Rule 702 of the Federal Rules of Evidence. The Court has determined that these motions are ripe for disposition, and that no evidentiary hearings or other proceedings are necessary at this time.

## II. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987). A party is entitled to judgment as a matter of law unless the nonmovant demonstrates that a genuine dispute exists as to an element of his case on which he has the burden of proof. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Everett*, 833 F.2d at 1510. A failure by the opposing party to point out disputed facts will be taken as an admission that no material factual dispute exists. Local Rule 8. The function of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." *Anderson v. Liberty*

---

**2.** The parties' discovery efforts have been unsuccessful in determining when or where this tire was purchased and mounted on the van. Carmichael has testified that the tire was on the van when he bought it, and that he did not replace it prior to the accident; however, it is unclear how long the tire had been on the van or how many miles the tire had traveled before Carmichael acquired the van.

**3.** In 1984, defendant Samyang Tires, Inc. ("Samyang") was merged into Kumho. Defendant Kumho was the surviving corporation; thus, Samyang is not an independent corporate entity and is not a separate party to this lawsuit.

**1518**

*Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

▮▮▮ Summary judgment is improper "if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. If a reasonable factfinder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment. *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988). All factual matters are to be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Barnes v. Southwest Forest Industries, Inc.,* 814 F.2d 607, 609 (11th Cir.1987).

### III. Legal Analysis

#### A. *Plaintiffs' Claims Under AEMLD*

#### 1. Standard and Burdens of Proof

▮▮▮ The plaintiffs allege that the Hercules Superior XII tire on the right rear of the van failed because of a manufacturing or design defect. This theory of liability is embodied in the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). Under Alabama law, in order to prevail on an AEMLD claim, a plaintiff must show the following:

"(1) [H]e suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a) the seller is in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) Showing these elements, the plaintiff has proved a prima facie case although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller."

*Casrell v. Altec Industries, Inc.,* 335 So.2d 128, 132–33 (Ala.1976).

Thus, the AEMLD imposes upon a manufacturer the duty to design and manufacture a product that is reasonably safe for its intended use. *See Townsend v. General Motors Corp.,* 642 So.2d 411, 415 (Ala.1994). However, "[p]roof of an accident or injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown." *Id.; see also Brooks v. Colonial Chevrolet–Buick, Inc.,* 579 So.2d 1328, 1333 (Ala.1991). Ordinarily, expert testimony will be required to prove the existence of a defect in AEMLD cases because of the complex and technical nature of such proof. *See Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.,* 395 So.2d 991, 995 (Ala.1981).

#### 2. Carlson's Testimony

The plaintiffs have presented the testimony of a single witness, Dennis Carlson ("Carlson"), in support of their claim that the tire failure was caused by a manufacturing or design defect. Plaintiffs have offered Carlson as an expert witness, pursuant to Rule 702 of the Federal Rules of Evidence. Carlson is a mechanical engineer employed as a tire consultant by George R. Edwards and Associates, Inc. He has earned a masters degree in mechanical engineering, and has worked as a consultant in the area of tire failure on a number of cases. Additionally, he worked for Michelin America for ten years in the field of tire design. The defendants challenge Carlson's qualifications to testify on the subject of tire failure and request an opportunity to explore his competency to offer an opinion on the causes of tire failure at a *Daubert*-type evidentiary hearing pursuant to Rule 104(a) of the Federal Rules of Evidence. However, the Court need not rest its ruling on a determination of Carlson's competence to offer an expert opinion on the causes of tire failure.[4] Therefore, the

---

4. Additionally, the Court notes that the parties have submitted some 520 pages of transcripts of

deposition testimony provided by Carlson in this matter, as well as some 670 pages of transcripts

Court will not examine his qualifications in any greater depth at this time, and will assume (without deciding) for the purposes of this order that Carlson is qualified to offer expert testimony on this subject.

Carlson opines that the tire failed because of poor or insufficient adhesion between the rubber, steel, and nylon components of the tire. *See* Carlson Deposition ("Carlson Depo."), at 411. This insufficient adhesion, in turn, caused the tire components to separate from each other, resulting in the flapping of the tread and the sudden, catastrophic loss of air pressure in the tire. Carlson Depo., at 331. Loss of adhesion, according to Carlson, may be caused by either abuse or defect. Carlson Depo., at 243–244. The only form of abuse at issue in the present case is overdeflection, which may occur when a tire is underinflated, overloaded, or both.[5] Carlson Depo., at 217. In order to determine whether a defect has caused the tire failure, Carlson looks for the following signs of overdeflection: (1) greater tread wear on the shoulder than in the center of the tire; (2) sidewall deterioration or discoloration; (3) abnormal bead grooving on the tire; and (4) rim flange impressions. Carlson Depo., at 250–52, 390. When Carlson fails to find sufficient evidence of two of these four indicators in a tire, he rules out overdeflection as a cause of the tire failure and, barring other evidence of abuse, concludes that the loss of adhesion was prompted by a manufacturing or design defect. Carlson Depo., at 278–79. As Carlson testified, "when we look for the indicators of overloading or overdeflection, as I see, and eliminate those as a possible cause, then there is nothing else but a manufacturing defect." Carlson Depo., at 278.

With respect to the tire at issue in this case, Carlson examined it for the first time on the morning that his deposition was taken and performed no tests on any of the minivan's tires at that time.[6] Carlson Depo., at 328. His analysis was limited to a visual inspection of the tire, though he conceded that such actions as cutting the tire could reveal additional pertinent information. Carlson Depo., at 381. Carlson indicated that the separation most likely began under a bald spot on the tire, where the tread was completely worn. Carlson Depo., at 488. In his examination of the tire, Carlson observed some evidence of uneven tread wear, sidewall deterioration, abnormal bead grooving, and rim flange impressions; however, he found that the evidence with respect to each factor was either insufficient to demonstrate overdeflection or that it was attributable to causes other than overdeflection. Carlson Depo., at 403–06, 445–46, 449–56. Based on this testimony, Carlson asserted that there was no evidence of overdeflection in the tire. Carlson Depo., at 462.

After ruling out overdeflection and other forms of abuse, Carlson concluded that the tire failure must have been precipitated by a manufacturing or design defect in the tire. However, neither the plaintiffs' written submissions nor the Court's review of Carlson's voluminous deposition transcripts indicate that Carlson identified any affirmative evidence of a defect in the tire. Stated differently, Carlson's expert opinion that the tire failure was caused by a manufacturing or design defect is founded on his determination that there is a paucity of evidence of overdeflection or other abuse, rather than by his ability to pinpoint any affirmative evidence of a defect.

**3. Admissibility of Carlson's Testimony**

■ The defendants' collective motion for summary judgment on the AEMLD claim is

of deposition testimony provided by him in another case. The Court has reviewed these documents in some detail, and has determined that no Rule 104(a) evidentiary hearing will be necessary as to the substance of Carlson's proposed trial testimony, the methodology used by Carlson, or the basis for his conclusion that the tire failed due to a manufacturing or design defect.

5. Overdeflection causes the tread of a tire to become too hot, causing deterioration in the sidewall, cords, and rim of the tire. Carlson Depo., at 219–221.

6. This initial observation occurred after Carlson had issued his written report and conclusions regarding the cause of the blowout. The plaintiffs' original expert, George Edwards, had examined the tire previously and had taken photographs of the tire. Later, Carlson replaced Edwards as the plaintiffs' experts, reviewed Edwards' photographs, and adopted Edwards' report and conclusions almost verbatim as his own.

rooted in two separate arguments: (1) Carlson's testimony is inadmissible; and (2) Carlson's testimony contains no evidence that the product failed because of a defective rather than because of abuse.[7] The Court believes that the first of these arguments provides an adequate basis for granting summary judgment in this case.

■■■ The defendants contend that Carlson's testimony is inadmissible as expert testimony under the standard articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The *Daubert* case expounded on Rule 702 of the Federal Rules of Evidence, which states that:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702, Fed.R.Evid.

In particular, *Daubert* imposed on trial courts a sort of gatekeeper function in accordance with which they must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. In assessing whether proffered scientific testimony is admissible, a court must consider such factors as: (1) whether the technique or theory used may be tested or refuted; (2) whether the technique or theory has been a subject of peer review or publication; (3) the known or potential rate of error of a technique; and (4) the degree of acceptance of a theory or technique within the relevant scientific community. *Id.* at 589–95, 113 S.Ct. at 2795–97, 125 L.Ed.2d at 482–83. In so doing, the trial court is reminded that "the overarching subject [of a *Daubert* analysis] is the scientific validity— and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 594–95, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.

■■■ Regarding the first *Daubert* factor, it appears that Carlson's method for analyzing the tire is not susceptible to testing or falsification. Carlson admits that his work is "subjective" and that there is a certain degree of "uncertainty" in his conclusions.[8] *See* Carlson Depo., at 276–84. When questioned specifically, he could not identify any specific tests or other procedures which could be used to corroborate or refute the results of his visual inspection of the tire at issue.[9] Carlson Depo., at 276–78; 295–96; 302, 387–88. Indeed, when asked specifically if there were any chemical tests which he could have applied to this tire, Carlson responded, "I

---

7. The Court rejects the defendants' argument that Carlson's testimony, if admissible, failed to make a prima facie showing that the tire was defective. Carlson's finding of a defect was prompted by his conclusion that insufficient signs of abuse were present, and his belief there can be no causes of tire separation other than abuse and defect. As Carlson colorfully put it in his deposition: "Well, besides nuclear war that's about all there is that causes tire failure." Carlson Depo., at 392. Despite defendants' exhortations to the contrary, the Court perceives no inherent flaw in a process-of-elimination form of proof per se, as long as the underlying methodology is scientifically valid.

8. At one point in Carlson's deposition, the following exchange took place:

"Q: And if you don't find the abuse factors or the evidence on the abuse factors is inconclusive, then what do you do?
A: Well, then it's probably a bad tire.
Q: Probably a bad tire?
A: Yes. And you got to look and see.

Q: I guess then it all comes down to the subjective opinion of whoever is doing the tire failure analysis as to whether those factors of abuse you've listed ... exist in a given tire?
A: Well, it's subjective if you have the knowledge and experience to analyze those factors."
Carlson Depo., at 402.

9. Carlson does identify a number of tests which could be used to determine the adhesion of a particular tire. However, he states that he was unable to perform such tests on this tire for the following reasons:

"Q: Are there any tests of adhesion that you can use after a tire failure?
A: After a tire failure there are none that I would use.
Q: And why wouldn't you use them?
A: Well, I think that after a tire has been through an accident scenario or something like that that it gives you rather dubious results.
Q: It would be unreliable?
A: I would think they would be unreliable."
Carlson Depo., at 295–96.

don't think there are any that would apply to this case." Carlson Depo., at 388.

As to the second factor, Carlson concedes that there are no publications or papers which have approved or otherwise discussed his techniques for tire failure analysis.[10] He does identify a number of publications and research papers regarding tests which can be performed to assess the causes of abnormal tread wear and asserts that he relied on such papers in his testimony in this case. Carlson Depo., at 285. These papers do not back his techniques, however, as Carlson does not indicate that he actually performed any of the tests described in this literature on the tire in question; rather, he contends only that he is "probably" relying on the information provided in those documents as "background" for the work that he did. Carlson Depo., at 285, 287. Carlson was able to point to no other publications on which he relied in performing his analysis. Thus, it is evident from Carlson's testimony that there are no papers or publications which specifically address the propriety of the visual inspection method of analyzing failed tires which Carlson employed in this case.

The third *Daubert* factor concerns the known or potential error rate of the technique used. In this case, Carlson testified repeatedly that he did not know the potential error rate of his method for determining whether a given tire failure is the result of abuse or a defect. Carlson Depo. at 281, 284, 311, 474–75. Carlson believes that differentiation between the two causes involves one's experience, and indicates that he has looked at many tires. Carlson Depo., at 281–84. However, he admits that he does not know whether his previous analyses of failed tires have been correct or incorrect; moreover,

there is no evidence that he (or anyone else) has tested his methods in a controlled laboratory setting to gauge their accuracy in correctly distinguishing between overdeflected and defective tire separations. *Id.*

Finally, Carlson's methodology does not pass muster under the fourth prong of the *Daubert* analysis, either. The Court cannot conclude from the record before it that Carlson's analysis is generally accepted in the relevant scientific community. Indeed, the only evidence of general acceptance is Carlson's bare, unsupported statement that other tire experts have testified in depositions that methods similar to those used by Carlson are acceptable means of distinguishing between abused tires and defective tires in tire failure cases.[11] Though the plaintiffs claim that the defense tire expert, Thomas Dodson, uses the same method of analysis as that employed by Carlson, the excerpted portions of Dodson's deposition provided by the plaintiffs lend no support to this contention. *See* Exhibit A to Plaintiffs' Opposition to Motion to Exclude Testimony of Dennis Carlson. There is simply no evidentiary basis upon which this Court could conclude that the relevant scientific community accepts a visual-inspection, process-of-elimination analysis of tire failure in the manner that it was performed by Carlson.

Thus, it appears that none of the four admissibility criteria outlined by the *Daubert* court are satisfied in this case. However, the plaintiffs respond by arguing that Carlson's testimony is a mere "technical analysis", rather than scientific evidence, and that such testimony is therefore exempted from *Daubert*-style scrutiny. In support of this argument, plaintiffs point out that Rule 702 of the Federal Rules of Evidence distin-

10. The relevant portion of Carlson's testimony is as follows:

"Q: So you arrive at a conclusion in your tire failure analysis by eliminating other causes?
A: Yes.
Q: Are there any publications that would discuss how you go about doing that sort of tire failure analysis?
A: I don't think so."
Carlson Depo., at 303.

11. The relevant testimony from the deposition is as follows:

"Q: Are there any publications that would discuss how you go about doing that sort of tire failure analysis?
A: I don't think so.
Q: Are there any generally accepted theories on how you go about doing that sort of tire failure analysis?
A: I think this is a generally accepted theory is [sic] to eliminate all the other causes.
Q: And what do you base that statement on?
A: I've read many depositions from tire experts."
Carlson Depo., at 303.

guishes between "scientific" and "technical" evidence, while the *Daubert* Court was concerned solely with the "admissibility of purportedly scientific evidence." *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480.

■■■ This argument is meritless. While the Supreme Court's ruling in *Daubert* was specifically directed at the admissibility of certain scientific evidence, the plaintiffs have not directed the Court's attention to a single case in which a court has refused to apply *Daubert* to a "technical analysis". On the contrary, the *Daubert* standard has been routinely utilized by lower courts in assessing the admissibility of "technical analyses" similar to that at issue in the present case. *See, e.g., Strickland v. Royal Lubricant Co.,* 911 F.Supp. 1460 (M.D.Ala.1995) (using *Daubert* test to assess admissibility of mechanical engineer testimony regarding faulty respirator); *Dickerson v. Cushman, Inc.,* 909 F.Supp. 1467, 1472 (M.D.Ala.1995) (mechanical engineer testimony regarding safe design of mobile tanks); *Bowers v. Northern Telecom, Inc.,* 905 F.Supp. 1004 (N.D.Fla.1995) (ergonomist testimony concerning computer keyboard design); *Byrnes v. Honda Motor Co., Ltd.,* 887 F.Supp. 279, 282 (S.D.Fla.1994) (testimony concerning proper safety equipment on motorcycle); *Williamson v. General Motors Corp.,* 1994 WL 660649, *4 (N.D.Ga., Sept. 30, 1994) (mechanical engineer testimony concerning engine drag theory of automobile accident). Thus, the distinction urged upon the Court by plaintiffs has not been recognized by the lower courts in this Circuit.

More to the point, the technical/scientific distinction has been impliedly rejected by the Eleventh Circuit. In *United States v. Lee,* 25 F.3d 997 (11th Cir.1994), the Eleventh Circuit remanded with instructions for the district court to consider whether the results of "specialized, technical diagnostic machinery" comported with *Daubert. Id.* at 998. In particular, the *Lee* court held that:

"[C]ourts do not distinguish between the standards controlling admission of evidence from experts and evidence from machines.... *Daubert* applies not only to testimony about scientific concepts but also

to testimony about the actual applications of those concepts." *Id.* at 988–99.

The plaintiffs may be correct that Carlson's testimony does not concern a scientific concept per se; however, it certainly is testimony about an application of scientific concepts involved in physics, chemistry, and mechanical engineering. In other words, Carlson's method is necessarily grounded in some scientific foundation, and *Lee* requires this Court to consider the legitimacy of both the scientific foundation and the actual application of that foundation employed by Carlson. Accordingly, plaintiffs' efforts to recast Carlson's testimony in a "technical" light cannot succeed. The *Daubert* test clearly applies in this case, and plaintiffs' argument to the contrary is specious.

This Court's *Daubert* analysis illustrates that none of the criteria set forth by the Supreme Court for admissibility of scientific evidence under Rule 702 have been satisfied in this case. *See Clement v. Griffin,* 634 So.2d 412, 427 (La.App. 4 Cir.1994) (finding that expert testimony concerning defect in tire was inadmissible under *Daubert* ). The *Daubert* Court assigned to trial courts "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485. The Court has a responsibility to serve as a gatekeeper, ensuring that purportedly expert testimony does not reach a jury unless that testimony is reliable and reasonable. *See id.* As set forth in his deposition, Carlson's testimony is simply too unreliable, too speculative, and too attenuated to the scientific knowledge on which it is based to be of material assistance to the trier of fact; hence, it cannot be accorded the status of admissible expert testimony. Therefore, the Court **GRANTS** the defendants' motion to exclude the testimony of Dennis Carlson pursuant to the test articulated by the Supreme Court in *Daubert.*

**4. Plaintiff's Evidence of a Defect**

■■■ To maintain a claim under the AEMLD, a plaintiff cannot simply prove that an accident occurred and that he was injured; rather, "a defect in the product must be affirmatively shown." *Townsend v. General*

*Motors Corp.*, 642 So.2d 411, 415 (Ala.1994). In the absence of Carlson's testimony, the plaintiffs have offered no evidence whatsoever that the right rear tire on the minivan was defective. Although they repeatedly recite the principle that proof of the specific defect which caused the product to fail is not required, *see Sears Roebuck & Co. v. Haven Hills Farm, Inc.*, 395 So.2d 991, 994 (Ala. 1981), the plaintiffs have directed the Court to no other evidence that the tire suffered from any manufacturing or design defect at all. Alabama law is unambiguous that, while no proof of a specific defect which caused the product to fail is necessary, an AEMLD plaintiff must still offer some affirmative evidence of a defect in the product. *See Townsend*, 642 So.2d at 415. This the plaintiffs have not done; therefore, the Court has no choice but to **DISMISS** the plaintiffs' AEMLD claim against the defendants.

## B. *Plaintiffs' Remaining Claims*

### 1. Negligence/Wantonness Claims

■ The exclusion of Carlson's testimony effectively bars the plaintiffs from proceeding with their negligence and wantonness causes of action against the defendants. The plaintiffs have offered no admissible evidence whatsoever from which a reasonable fact finder could conclude either that the defendants breached some duty of care or that any such breach caused the injuries sustained by the plaintiffs; therefore, the negligence cause of action cannot stand against any of the defendants. Likewise, there is no evidence that any of the defendants acted with reckless indifference to consequences, or otherwise acted in a wanton manner with respect to the tire in question. Therefore, the plaintiffs' claims against defendants for negligent and wanton design, manufacture, distribution, marketing, and sale of the tire in question are due to be, and the same hereby are, **DISMISSED.**

### 2. Breach of Warranty Claims

■ The plaintiffs' breach of warranty theory of liability is something of a puzzle to the Court. Plaintiffs have never alleged that any of the defendants sold the tire directly to them, nor have they contested the fact that the minivan (including the tire which ultimately failed) was sold to them in used condition by a nonparty used car dealership on an "as is" basis. Given these facts, the Court does not see any factual or legal mechanism through which any of the defendants can be considered to have made any warranty to the plaintiffs. Certainly, there is no evidence that defendants ever sold the tire to the plaintiffs, so as to create an express or implied warranty by a seller to a buyer. Even if there were such a warranty, however, there is no evidence that the tire was not merchantable at the time of sale or that the tire was unfit for any purpose. In short, the Court fails to see how the undisputed facts of this case can possibly lend themselves to a cause of action against the tire manufacturers and distributors for breach of warranty. The parties' joint pretrial order is of no assistance, either, as it lists as a triable issue only whether "any act or omission of any of the Defendants constitute[d] breach of warranty." *See* Joint Pretrial Order.

The plaintiffs' amorphous, unsupported breach of warranty claim cannot withstand summary judgment scrutiny. Rather, this claim seems to represent just the sort of "shotgun pleading" which recently prompted Chief Judge Tjoflat of the Eleventh Circuit to issue the following admonition:

> "Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Anderson v. District Bd of Trustees of Central Fla. Community College*, 77 F.3d 364, 1996 WL 71087, *1 (11th Cir., Feb. 20, 1996).

Given the plaintiffs' failure to express their breach of warranty claim with any modicum of clarity in the pretrial order and their failure to respond in any manner to the defendants' motion for summary judgment as to that claim, the breach of warranty claim cannot proceed any further in this litigation. Therefore, the Court **GRANTS** the defendants' motion for summary judgment on the breach of warranty claim.

## IV. Conclusion

For all of the foregoing reasons, the Court hereby **GRANTS** the defendants' motion to exclude the testimony of Dennis Carlson, and **GRANTS** the defendants' motion for summary judgment as to all causes of action brought by the plaintiffs. The plaintiffs' claims are hereby **DISMISSED** with prejudice.

It is so **ORDERED.**