**In re ARMSTRONG WORLD INDUSTRIES, INC., et al., Debtors.**

**No. 00–04471 (RJN).**

United States Bankruptcy Court, D. Delaware.

Oct. 22, 2002.

Rebecca L. Booth, Richards, Layton & Finger, Wilmington, DE, Mark D. Collins, Richards Layton & Finger, Wilmington, DE, Deborah E. Spivack, Richards, Layton & Finger, Wilmington, DE, Sharon M Zieg, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for debtors.

Robert T. Aulgur, Jr., Whittington & Aulgur, Odessa, DE, Scott Baldwin, Jr., Baldwin & Baldwin L.L.P., Marshall, TX, Gary L. Barnhart, Missouri Department of Revenue, General Counsel's Office, Jefferson City, MO, Ian Connor Bifferato, Bifferato, Bifferato & Gentilotti, Wilmington, DE, Jean Marie Breen, Pension Benefit Guaranty Corporation, Office of the General Counsel, Washington, DC, Michael G. Busenkell, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, David E. Cherry, Campbell–Cherry–Harrison–Davis–Dove, Waco, TX, William E. Chipman Jr., Jr., Greenberg Traurig, LLP, Wilmington, DE, Joshua D. Cohen, Hartman Underhill & Brubaker LLP, Lancaster, PA, Victoria Watson Counihan, Greenberg Traurig, LLP, Wilmington, DE, Charlene D. Davis, The Bayard Firm, Wilmington, DE, Henry Jon DeWerth–Jaffe, Pepper Hamilton LLP, Philadelphia, PA, Gary R. Dodge, Dover, DE, Kristi J. Doughty, Whittington & Aulgur, Odessa, DE, Timothy P. Dowling, Gary, Thomasson, Hall & Marks, P.C., Corpus Christi, TX, Daniel W Egeler, Ann Arbor, MI, Mark E. Felger, Cozen O'Connor, Wilmington, DE, Matthew A. Gold, Argo Partners Inc., New York City, Robert S. Goldman, Phillips, Goldman & Spence, Wilmington, DE, Philip J. Goodman, Birmingham, MI, Jay L. Gottlieb, Brown Raysman Millstein Felder & Steiner, New York City, Jason W. Harbour, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Megan Nancy Harper, Bifferato, Bifferatto & Gentilotti, Wilmington, DE, David Michael Hillman, Mayer, Brown, & Platt, New York City, James E. Huggett, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE, John D. Huige, Grosse Point Woods, MI, Michael T. Kay, The Dow Chemical Company, Midland, MI, Michael V. Kelley, Kelley & Ferraro, L.L.P., Cleveland, OH, Steven K. Kortanek, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE, Monica Leigh Loftin, Potter Anderson & Corroon LLP, Wilmington, DE, Aileen F. Maguire, Campbell & Levine, Wilmington, DE, Katharine L. Mayer, McCarter & English, Wilmington, DE, Michael J. McGinnis, Houston, TX, Peter B. McHugh, Englert, Coffey & McHugh, LLP, Schenectady, NY, Selinda A. Melnik, Buchanan Ingersoll PC, Wilmington, DE, Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE, Rick S. Miller, Ferry & Joseph, Wilmington, DE, Michael P. Morton, Michael P. Morton, P.A., Wilmington, DE, Christine L. Myatt, Adams Kleemeier Hagan Hannah & Fouts, Greensboro, NC, Richard W. Riley, Duane Morris LLP, Wilmington, DE, Andrea Sheehan, Law Offices of Robert E. Luna, P.C., Dallas, TX, Christopher S. Sontchi, Ashby & Geddes, Wilmington, DE, John Mark Stern, Office of the Attorney General of Texas, Bankruptcy & Collections Division, Austin, TX, William David Sullivan, Elzufon Aus-

tin Reardon Tarlov & Mondell, Wilmington, DE, Andrew D. Sweat, Wise Carter Child Caraway, Professional Association, Jackson, MS, Theodore J. Tacconelli, Ferry & Joseph P. A., Wilmington, DE, William F. Taylor, Jr., McCarter & English LLP, Wilmington, DE, Duane David Werb, Werb & Sullivan, Wilmington, DE, Joanne Bianco Wills, Klehr Harrison Harvey Branzburg & Ellers, Wilmington, DE, Christopher Martin Winter, Morris Nichols Arsht & Tunnell, Wilmington, DE, Steven M. Yoder, The Bayard Firm, Wilmington, DE, Matthew G. Zaleski III, Campbell & Levine LLC, Wilmington, DE, Peter E. von Haam, Atty. General of the State of California, Los Angeles, CA, for creditors.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: MOTIONS OF THE DEBTORS AND ASBESTOS PROPERTY DAMAGE COMMITTEE TO EXCLUDE EVIDENCE

RANDALL J. NEWSOME, Bankruptcy Judge.

This chapter 11 case is before the court pursuant to motions by the debtors and the Asbestos Property Damage Committee to exclude certain evidence on the grounds that it fails to meet the standards of scientific reliability and validity mandated by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The only issue before the court is whether the "indirect method" for measuring airborne asbestos expounded in American Society for Testing and Materials D5755 ("D5755")[1] meets the *Daubert* test.[2] This issue arises in the context of some 600 claims for damage to buildings from the presence of asbestos-containing floor tile manufactured by debtors Armstrong World Industries, Inc. and affiliates ("AWI").

A timed hearing was held on September 26 and 27, 2002, at which the debtors and the Asbestos Property Damage Committee ("Committee") were each given eight hours to present evidence on this issue. Neither side used the full amount of their allotted time. Based on the evidence presented, the court hereby makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Although the evidence presented was wide-ranging and voluminous, many of the essential facts are undisputed. From the 1930's until 1983 AWI incorporated asbestos into certain of its asphalt and vinyl floor tiles. Unlike many other asbestos-containing building products, floor tile is not considered a friable material. When properly maintained and not abused (i.e. by sanding, gouging, scraping etc.), it presents a minimal risk of asbestos release in buildings. *See* Exh. 21, p. 388.

The long-recognized health risks associated with exposure to asbestos have spurred the search for methods of accurately testing the amount of asbestos in the air inside buildings. It is generally agreed that the risk of harm from asbestos stems from inhaling fibers, not from how

1. The full title of this ASTM standard is "Standard Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Concentrations."

2. The Committee has raised a number of other issues in its motion. None of these issues was adequately addressed in either the evidence or the briefs of either side. Accordingly, the court declines to resolve them at this time. Objections to the qualifications of each side's experts were overruled at the hearing. All of the witnesses who testified qualify as experts "by knowledge, skill, experience, training or education" under Federal Rule of Evidence 702. *See also Holbrook v. Lykes Bros. Steamship Co., Inc.,* 80 F.3d 777, 781 (3d Cir.1996)

much asbestos is on the surfaces of a room. Thus, the focus of testing is not on how much asbestos is present in a room or building, but upon how many respirable asbestos structures are in the air during normal activity.

Measuring airborne asbestos the amount is not an exact science. The nature of the activity in a room at any given time, airflow patterns in the room and a host of other variables can affect the test results. But it is generally recognized that the direct air sampling method for testing airborne asbestos and determining the consequent risk of harm is, in the words of Committee expert Dr. James R. Millette, "the best that we have." Trial Transcript ("Tr.") 580. This method is described in Method 7400, Issue 2 of the National Institute of Occupational Safety and Health's Manual of Analytical Methods. ( Exh. M) A portable, personal sampling pump is calibrated to draw air at an appropriate rate. Attached to the pump is a hose with a filter cassette on the other end. The filter cassette is affixed to the sampler in close proximity to the face. Sampling is then performed for varying amounts of time to obtain optimum fiber loading on the filter, i.e. shorter periods in dusty atmospheres, longer periods in cleaner ones. (Exh. M, "Sampling," Note 1)

At the end of the sampling period, the cassette is sealed and shipped to a testing laboratory. There, the filter is removed from the cassette, and a wedge is cut from it. The wedge is then "cleared," or collapsed by applying a small quantity of acetone with a pipet, so that all of the trapped fibers are exposed. The end product is then examined with a microscope and the number of fibers counted.

Method 7400 calls for examination with an optical microscope known as a phase contrast microscope ("PCM"). Only fibers 5 $\mu$ greater are counted, and the results are reported as the number of fibers per cubic centimeter of air. A more precise count of even smaller fibers and structures can be obtained by use of a transmission electron microscope ("TEM") using the same sampling procedure. The number of fibers per cubic centimeter of air are then calculated based on the number of liters of air tested and the number of fibers counted on the filter sample.

The indirect method described in D5755 (Exh. A) has been proposed by Dr. Millette and others as a substitute for the direct method of measuring airborne asbestos. Under this method, a 100–cubic centimeter area of flooring is vacuumed for two minutes using a nozzle made from plastic hose which is attached to a filter cassette, which in turn is attached to a vacuum pump. After the floor is vacuumed, both the nozzle and the cassette are sealed and sent to a testing laboratory. The cassette is opened, and 10 mL of a 50/50 solution of alcohol and water are poured into the cassette, which is resealed and shaken lightly for three seconds. The contents of the cassette are poured through a screen into a 200 mL sample bottle. This procedure is repeated two additional times. The nozzle is washed out with the same 50/50 solution and the contents poured into the sample bottle. Acetic acid is added to bring the contents of the sample bottle to a ph of 3 to 4. The contents of the bottle are passed through a filter and an additional 20 mL of water are added. The contents are shaken again for three seconds and allowed to settle for two minutes. The bottle is put into an ultrasonic bath and sonicated for three minutes. An aliquot of the solution is then withdrawn and deposited onto a filter.

Plugs from the wet filter are placed on a glass slide and dried in a desiccator. The plugs are then cleared and prepared for TEM analysis. All asbestos structures are

counted, including matrices (fibers attached to a particle of material, such as asphalt or vinyl), clusters (groupings of fibers), or fibrils (a single fiber). Exh. A, §§ 3.1.3–3.2.10. The results are reported as asbestos structures per square centimeter. By employing a statistical convention known as a K-factor, which is "[t]he ratio between the air level...and the surface loading level..." (Exh. 11 at 371), advocates of this method attempt to predict the amount of asbestos that is entrained into the air from the floor.

The parties seem to agree that the number of asbestos structures, particularly smaller fibers, found through the indirect method is almost always significantly higher than through the direct method. Tr. 532; *see also* Exh. B, p. 33. A number of theories have been propounded to explain this so-called positive bias. One hypothesis is that debris obscures some particles in the direct method which is cleared away in the indirect method. Exh. B, p. 34. Most theories for the increased count center on the additional steps used to prepare an indirect sample. Some studies suggest that the sonication and shaking steps break larger fibers into smaller ones, or tear apart clusters of fibers, thus exaggerating the total fiber count. Exh. KKK; Exh. b, p. 34. It has also been suggested that these steps, as well as the liquids added to the samples, might cause the matrices to dissolve or break up, thereby releasing fibers bound to other materials. Exh. KKK, p. 1729. D5755 itself recognizes the potential viability of all of these theories, noting that "the procedure described neither creates nor destroys asbestos, but it may alter the physical form of the mineral fibers....[A] single, large asbestos containing particle(s)...dispersed during sample preparation may result in anomalously large asbestos concentration results in the TEM analyses of that sample." Exh. A, pgs. § 1.4.1; § 5.2.

The data from the indirect method may also suffer from significant variability in the size and number of structures reported by different laboratories preparing and analyzing identical samples. One study reported that "[t]he range of results for each sample type revealed a 1000–fold difference between the highest and lowest concentrations." Exh. JJJ, p. 3013.

Putting aside questions of bias and variability, there are significant doubts concerning the correlation between surface dust and airborne asbestos. Those doubts are raised by D5755 itself, which states as follows:

> This test method does not describe procedures or techniques required to evaluate the safety or habitability of buildings with asbestos-containing materials....

> At present, a single direct relationship between asbestos-containing dust and potential human exposure does not exist.

Exh. A, § 5.1.1–5.1.2.

Although Dr. Millette testified on direct examination that K-factors could be used to predict the level of airborne asbestos entrained from dust, his testimony on cross-examination completely undercut this conclusion. He acknowledged that K-factors were originally devised from voluminous data over numerous years suggesting correlations between radioactive dust and entrainment of that dust into the air. *See* Exh. LLL, p. 378–79. Dr. Millette further admitted that K-factors have never been developed for asbestos dust on floor tile (Tr. 569–70); that there has never been a controlled statistical analysis of the relationship between asbestos counts using the indirect method and actual airborne concentrations (Tr. 573); that dust results do not give an indication of what has been in the air, nor do they demonstrate release potential of asbestos-containing materials (Tr. 566–67); that there is no scientific

method to measure risk quantitatively from the indirect method (Tr.568); and that the direct method is the best way to obtain an accurate reading of asbestos exposure for purposes of measuring risk based on epidemiological studies (Tr. 580).

## CONCLUSIONS OF LAW

■ *Daubert* holds that expert testimony is admissible under Rule 702 of the Federal Rules of Evidence only if "the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592–93, 113 S.Ct. 2786. The Supreme Court set forth a non-exclusive list of four factors to guide the first part of this inquiry, and the U.S. Court of Appeals for the Third Circuit has expanded the list to eight:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) the method is generally accepted; (6) the relationship of the technique. to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology and (8) the non-judicial uses to which the method has been put.

*In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 742 n. 8 (3d Cir.1994), *cert. denied,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995)("*Paoli II*"); *see also Elcock v. Kmart Corp.,* 233 F.3d 734, 745 (3d Cir.2000). The inquiry into scientific validity and reliability is intended to be a flexible one, and this list of factors "neither necessarily nor exclusively applies to all experts in every case." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). But *"any* step that renders the analysis

unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." Paoli II,* 35 F.3d at 745.

■ The second part of the *Daubert* inquiry—whether the methodology can be applied to the facts—goes to the question of "fit." " 'Fit' is not always obvious, and scientific validity for one purpose is not always scientific validity for other, unrelated purposes. . . . Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

■ The proponent of an expert's opinion has the burden of establishing both branches of this test by a preponderance of the evidence. *Paoli II at* 744. But "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786; *quoted in Paoli II,* 35 F.3d at 744.

■ Turning first to the eight-part test for determining scientific validity and reliability, I find the following. (1) The "indirect method" as described in D5755 might be a testable hypothesis for measuring asbestos in surface dust, but as of yet, no one apparently has been able to test the hypothesis in a sufficiently controlled fashion. In other words, while everyone (including Dr. Millette) recognizes that the method has a positive bias, no one has been able to calculate the exact degree of bias or to identify the exact cause or causes of that bias. (2) What peer review the method has received leaves it's accuracy in serious doubt. (3) It follows from these conclusions that the known or potential rate of error has not been quantified. (4) There are standards controlling the

technique's operation. They are quite clearly set out in D5755. But the *results* flowing from those standards are not calculable. Although human error will always intrude, standards for gathering samples, whether of dust or air, can be written precisely and, within reason, uniformly applied. But determining how hard to shake the dust and liquid mixture in preparing the samples for examination is too subjective to be controlled. Furthermore, it is impossible to determine what that shaking, combined with sonication, may do to the particular properties of the dust sample as it existed on the floor at the time it was vacuumed into the filter. (6) Because dust on the floor has, at present, no statistical correlation to dust in the air, the indirect method has no relationship to the direct method, which is the generally accepted means of measuring the amount of asbestos in the air and the consequent risk of harm. (7) All of the experts who testified were equally competent to testify regarding this subject. No evidence was presented as to factor (8). Based upon all of these factors, I conclude that the indirect method is not a scientifically valid method of *quantifying* the level of asbestos contamination in a room or building. It is, however, a useful tool for determining whether there is *any* asbestos on the surfaces of a room or building.

Even if the indirect method met the first branch of the *Daubert* test, the evidence is clear and convincing that it does not meet the second part of that test. Because there is no statistical correlation between surface dust and airborne dust, and because airborne dust is what poses the risk of harm, the indirect method has no valid scientific connection to the pertinent inquiry. In other words, the indirect method simply doesn't fit. Any attempt to estimate airborne asbestos levels from measurements of surface dust would be based on nothing more than subjective belief and sheer speculation. *See Paoli II* at 742; *see also Oddi v. Ford Motor Company*, 234 F.3d 136, 145–46 (3d Cir.2000).

Accordingly, for the reasons stated above, the debtors' motion to exclude expert opinions and other evidence based upon the indirect method or D5755 is hereby granted in its entirety. The Committee's motion to exclude evidence is denied without prejudice.

IT IS SO ORDERED