Alvin J. SITTIG, Verbie R. Sittig

v.

LOUISVILLE LADDER GROUP LLC

No. CIV. A. 00–0378.

United States District Court, W.D. Louisiana, Lafayette-Opelousas Division.

March 22, 2001.

Jerry Mallet, Breaux Bridge, LA, for plaintiffs.

James Silverstein, New Orleans, LA, for defendant.

### RULING ON MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS RICHARD S. SCOTT AND GERALD S. GEORGE

METHVIN, United States Magistrate Judge.

*(Rec.Doc. 64)*

Before the court is defendant's motion to exclude the testimony of plaintiffs' liability experts pursuant to Fed.R.Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Plaintiffs filed an opposition, defendants replied, and plaintiffs filed a supplemental memorandum in opposition.[1]

### Background

This products liability suit involves an aluminum ladder which allegedly shifted during use causing plaintiff to fall and injure himself. Plaintiffs allege the following pertinent facts: In February 1999, plaintiff Alvin Sittig purchased a 16–foot aluminum extension ladder manufactured by defendant at a local Wal–Mart store.[2] The next day, Mr. Sittig used the ladder in connection with repair work on a vent on top of his trailer. Mr. Sittig extended the ladder approximately one or two rungs so that the top of the ladder was positioned approximately 6–12 inches above the top of the trailer. The ladder was not secured to the trailer, nor did anyone hold the ladder for stability. Mr. Sittig stood on the ladder for approximately one hour while repairing the vent. Mr. Sittig's wife assisted by holding the vent open from the inside of the trailer. After completing the repairs, Mr. Sittig climbed down the ladder without incident. Once down, Mr. Sittig remembered that he had left his tools on the top of the trailer, and he climbed back up the ladder. The tools were approximately 6–12 inches to the right of the ladder, therefore, Mr. Sittig reached to the right for his tools. At this point, Mr. Sittig felt the ladder "go" to his right and he and the ladder fell to the ground, resulting in the complained-of injuries.[3]

---

1. Rec. Doc. 78, 84, 89.

2. Exhibit to Rec. Doc. 26, Sittig Deposition 4/19/00, p. 20.

3. Exhibit to Rec. Doc. 26, Sittig Deposition 4/19/00, pp. 64–77.

*Louisiana Products Liability Law*

In this diversity claim, Louisiana products liability law applies to plaintiffs' claims. The Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.51 et seq., sets forth the exclusive theories of manufacturers' liability for damages caused by their products.[4] A manufacturer is liable for damage caused by an unreasonably dangerous characteristic of a product when such damage arose from a reasonably anticipated use of the product. La. R.S. 9:2800.54(A). A product may be unreasonably dangerous in one of four ways: (1) construction or composition; (2) design; (3) inadequate warning; or (4) nonconformity to an express warranty. La. R.S. 9:2800.54(B). The burden is on the plaintiff to prove that a product is unreasonably dangerous. La. R.S. 9:2800.55(D). Defects are not presumed by the mere occurrence of an accident. *Spott v. Otis Elevator Co.*, 601 So.2d 1355 (La.1992); *Scott v. American Olean Tile Co., Inc.*, 706 So.2d 1091 (La.App. 3d Cir.1998); *Jaeger v. Automotive Cas. Ins. Co.*, 95–2448 (La.App. 4th Cir.1996), 682 So.2d 292, *writ denied,* 688 So.2d 498 (La.1997).

Plaintiffs seek to establish that the ladder was unreasonably dangerous under two theories: defective design and inadequate warnings. Having examined the legal standards which apply, we now turn to an examination of the expert testimony upon which plaintiffs rely, and the standards which apply to such testimony.

### Expert Testimony

Plaintiffs intend to introduce the testimony of two experts to establish the alleged defects and the inadequate warnings. Each expert will be addressed in turn.

**1. Richard R. Scott**

Richard R. Scott, Ph.D. obtained a Bachelor of Science degree in mechanical engineering in 1960, and a Ph.D. in fluid mechanics with a minor in heat transfer and mathematics in 1968.[5] Dr. Scott has testified as an expert witness in at least ten cases.[6] One case involved a fall from a ladder, but the issue there concerned a safety harness and not the ladder itself. Dr. Scott has published articles concerning automobiles, propellers on small ships, landfill design, and heat transfer.[7] He has not written any articles concerning the design of ladders, and has never been involved in a case involving the design of a ladder until now.[8] He has never worked for a ladder manufacturer, has never de-

---

4. LSA–R.S. 9:2800.54, provides in relevant part as follows:

  § **2800.54. Manufacturer responsibility and burden of proof**

  A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

  B. A product is unreasonably dangerous if and only if:

  (1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

  (2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
  \* \* \*

5. Rec. Doc. 64, Exhibit D at pp. 7–8.

6. Rec. Doc. 64, Exhibit D at p. 10.

7. Rec. Doc. 64, Exhibit D at p. 20.

8. Rec. Doc. 64, Exhibit D at p. 19.

signed a ladder or any other product, nor has he ever testified as an expert in ladders or the design of ladders.[9] He has reviewed the American National Standards Institute's (ANSI) standards for ladders and he acknowledged that the ladder at issue was ANSI approved.[10] He has no experience in writing warnings for products, and he does not consider himself a warnings expert.[11]

Dr. Scott's expert report concludes that the cause of Mr. Sittig's fall was the separation of the base and fly sections of the ladder. Dr. Scott opines that if the lower guides on the fly section had been 3/4″ longer, no separation would have occurred. He also concluded that the ladder could be improved by substituting rubber end caps on the top end of the fly and the top end of the base section in order to increase the lateral friction force.[12]

Dr. Scott bases his conclusions upon various tests he conducted with a similar ladder described as "a Warner ladder whose design and construction I believe is identical."[13] After interviewing Mr. Sittig about the accident, examining the accident site, and inspecting scratch marks on the trailer involved in the incident, Dr. Scott conducted tests with the Warner ladder. In addition, Dr. Scott fabricated guides which were 3/4″ longer than the factory manufactured guides and installed them on the fly section of the Warner ladder. Additional tests were conducted with the longer guides in place. Dr. Scott stated in his

expert report that using the manufacturer's lower guides, only 14 to 15 pounds of force was required to separate the guides so that the fly section moves sideways. However, with the longer guides, 35 to 38 pounds of force was required.

## 2. Gerald S. George

Gerald S. George, Ph.D. obtained a Bachelor of Science degree in Health, Physical Education and Recreation in 1966, and in 1970 he obtained his Ph.D. in that same field with a major in biomechanics and a minor in psychology.[14] Dr. George has testified as an expert witness in fifty to one hundred cases,[15] most of them involving premises liability. His testimony in these cases addressed issues such as whether a party was properly instructed and/or supervised in connection with a trampoline, gymnastics, or cheerleading event where a personal injury occurred.[16] Dr. George has published books concerning sports skills and articles concerning the biomechanics of sports skills.[17] He has not written any articles concerning the design of ladders.[18] Prior to the case at bar, Dr. George has never been involved in a case involving the design of a ladder. He has never worked for a ladder manufacturer, nor has he ever designed a ladder.[19] Dr. George does not recall testifying as an expert in ladders or the design of ladders.[20] He has not written any warnings for ladders, nor does he consider himself an expert in ladder warnings.

---

9. Rec. Doc. 64, Exhibit D at pp. 19–20.

10. Rec. Doc. 64, Exhibit D at pp. 12 and 22.

11. Rec. Doc. 64, Exhibit D at pp. 30. Dr. Scott's testimony and his report do not provide opinions regarding the warnings claim.

12. Rec. Doc. 64, Exhibit B at p. 4.

13. Rec. Doc. 64, Exhibit B, p. 2, ¶ 3.

14. Rec. Doc. 64, Exhibit D at pp. 6–7.

15. Rec. Doc. 64, Exhibit D at p. 9.

16. Rec. Doc. 64, Exhibit D at p. 44.

17. Rec. Doc. 64, Exhibit D at p. 52.

18. Rec. Doc. 64, Exhibit D at p. 51–52.

19. Rec. Doc. 64, Exhibit E at p. 9.

20. Rec. Doc. 64, Exhibit E at p. 11.

Dr. George's expert report contains opinions on a number of issues, including whether the ladder set-up was reasonably safe for the intended tool retrieval task (it was); whether Mr. Sittig possessed "an appropriate level of performer readiness to accomplish safely the task of retrieving his tools" (he did); whether Mr. Sittig's reaching for his tools violated any recommended safety practices (it did not); whether Mr. Sittig's use of the ladder constituted "reasonably anticipated use" (it did); whether the ladder is defective in design (it is); and the most likely cause of the mishap ("the sudden and unexpected separation and lateral movement of the fly component about the base component of the Davidson ladder.") [21]

With respect to the ladder defect, Dr. George stated the following:

4) OPINION—the subject 16 ft. Davidson ladder is defective in design and unsafe for its intended use.

* * * Based upon the Richard R. Scott Engineering Report as well as physical re-enactment testing of the subject ladder, it can be readily demonstrated that the fly component of the ladder can and does separate from its base component with as little as 15 pounds of horizontal force. Such a scenario renders this ladder potentially unstable because the bottom portion of the fly component can *easily and unexpectedly* separate and become de-stabilized in the lateral plane during normal use.

Furthermore, it can be readily demonstrated that any unexpected lateral movement in one direction of the bottom portion of the ladder's fly component necessarily renders the feeling that the ladder and user are moving (falling) in the opposite lateral direction. The fact that such abject instability can be readi-

ly demonstrated in subject ladder under the conditions of the subject mishap speaks for itself in terms of a design defect.[22]

### *Legal Analysis*

Defendant contends that neither Dr. Scott nor Dr. George is qualified to testify as an expert in ladder design or warnings, and that their opinions do not meet the necessary legal standards under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Fed.R.Evid. 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under *Daubert,* district courts must function as gatekeepers, permitting only reliable and relevant expert testimony to be presented to the trier of fact. Before allowing expert testimony to be heard, the district court must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training or education." Fed.R.Evid. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods,* 163 F.3d 935 (5th Cir.1999). The issue is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues . . . ." *Tanner v. Westbrook,* 174 F.3d 542, 548 (5th Cir.1999) (quoting *Kumho,* 119 S.Ct. at 1178).

---

**21.** Rec. Doc. 64, Exhibit C at pp. 2–4.

**22.** Rec. Doc. 64, Exhibit C at p. 3 (emphasis in original).

In determining the admissibility of an expert's testimony, the court must undertake a two-part determination: (1) whether the proffered testimony is reliable, which requires an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid; and (2) whether the testimony is relevant. *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661 (5th Cir.1999), citing *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786.

### Qualifications and Reliability

Dr. Scott is a mechanical engineer and Dr. George is a biochemical engineer. Both have impressive educational and professional backgrounds. It is undisputed, however, that neither expert has any experience in ladder design. Neither has worked for ladder manufacturers, served on ANSI committees, or had any other experience with the design and/or manufacture of ladders. Likewise, neither expert has published articles relating to ladder design, taught any courses on ladder design, or otherwise had any involvement with designing ladders. Further, neither has written warnings for ladders or conducted any research or inquiries into the area of ladder warnings.

Plaintiffs maintain that the experts have substantial qualifications and that the fact that they do not have experience in the specific area of ladder design is not an issue to be weighed in a motion in limine, but rather is an issue for the jury. Plaintiffs argue that as long as these experts have sufficient qualifications, the court should admit their testimony and allow the jury to determine the weight to be allocated to their opinions. In support of this argument plaintiffs cite *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.")

Although an expert need not have specialization in every area in which he will be called to testify, Rule 702 nonetheless requires that the expert be qualified in the relevant field. In this case, a review of the Drs. Scott and George's depositions shows a lack of qualifications in the field of ladder design. See *Clark v. R.D. Werner Co., Inc.*, 2000 WL 666380, *5 (E.D.La.2000) (finding a metallurgical expert, who had no experience in designing ladders, unqualified to render expert opinion because he "failed to address the central issue of this case at sufficient level of intellectual rigor in the field of ladder design.")

At his deposition, Dr. Scott could not identify which type of ladder was involved in this case:

Q. Okay. Tell me what your understanding is in the difference between a type one and a type two ladder.

A. I forget which one it is that will take the most load. But they are graduated types. For instance—I might have them in backward order, but type one will take perhaps two hundred pounds. And that might be type three, because I don't think that's really important to absolutely remember that. But the type two would be an intermediate two hundred fifty pounds, and type three might be three hundred pounds. Or it might be two hundred and two twenty-five or two fifty.

Q. What type of ladder is involved in this case, type one, type two, or type three ladder?

A. It is either a type one or a type three.[23]

---

23. Rec. Doc. 64, Exhibit D at pp. 34–35.

Dr. George was also unfamiliar with the particular tests that ladders were subjected to in order to be ANSI approved, nor did Dr. George consider himself a ladder design expert.[24]

The validity of the methodology utilized by the experts is also questionable. Under *Daubert*, an expert's scientific theories and methodology must be measured against five factors to determine reliability: (1) whether the expert's theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir.1998) (citing *Daubert*). These factors also apply to "technical or specialized expert testimony as well as to scientific expert testimony." *Black v. Food Lion, Inc.*, 171 F.3d 308 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167, 1174 (1999)). The burden is on the proponent of the expert to prove by a preponderance of the evidence that the testimony is reliable. *Moore*, 151 F.3d at 276.

Dr. Scott admitted in his deposition that he could not establish with any certainty the angle at which Mr. Sittig had placed the ladder against the trailer, and he had to make certain assumptions in conducting his tests.[25] He also admitted that there are a number of variable factors which would alter his opinion, such as the exact placement of the ladder, whether the ladder was touching the camper, and the distribution of Mr. Sittig's weight between the fly and base sections at the time of the "shifting."[26]

Because there is no way to establish with any certainty exactly how the ladder was positioned in relation to the camper, and exactly how Mr. Sittig's weight was distributed when the ladder "shifted," it follows that neither Dr. Scott nor Dr. George can state with any certainty that Mr. Sittig's fall was caused by the separation of base and fly sections rather than by Mr. Sittig's loss of balance. While the experts' theories concerning separation are possibilities, other theories explain the fall equally well. Without some scientific basis to establish that ladder separation was the most likely cause of Mr. Sittig's fall, the proffered expert testimony amounts to speculation and will be of no assistance to the jury. *See Brown v. Parker–Hannifin Corp.*, 919 F.2d 308, 312 (5th Cir.1990), citing *Edmonds v. Illinois C.G.R.R.*, 910 F.2d 1284, 1287 (5th Cir.1990); *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1123–24 (5th Cir.1988) (per curiam); *Viterbo v. Dow Chemical Co.*, 826 F.2d at 422 (5th Cir.1987).

Dr. Scott conceded that the damage to the ladder could have been caused by Mr. Sittig simply losing his balance and falling to the ground with the ladder.[27] Dr. Scott also testified that the best way to determine exactly how the damage to the ladder occurred would be to conduct many more tests.[28]

Furthermore, Dr. Scott relied in large part upon Mr. Sittig's recollection of events in designing and conducting his tests. Defendant argues that these opin-

**24.** Rec. Doc. 64, Exhibit E at pp. 55–56.

**25.** Rec. Doc. 64, Exhibit D at p. 66.

**26.** Rec. Doc. 64, Exhibit D at pp. 68, 69, 155–159.

**27.** Rec. Doc. 64, Exhibit D at p. 116.

**28.** Rec. Doc. 64, Exhibit D at p. 122.

ions are unreliable because they rely on Mr. Sittig's version of events, which is ever changing, and because the opinions are speculative. It is undisputed that Mr. Sittig does not know why he fell. Mr. Sittig's testimony varies concerning his fall. However, he has never stated that he saw the base and fly sections of the ladder separate. Mr. Sittig testified, rather, that the ladder "shifted" to the right, causing him to instinctively attempt to counter the shift by moving his weight to the left, resulting in the fall.[29]

The number of assumptions which Dr. Scott made in conducting his limited tests precludes the possibility that his expert opinion is based upon a rigorous scientific inquiry which meets the necessary standards.

Dr. George's expert opinion relies heavily upon the tests and conclusions contained in Dr. Scott's expert report:

Q. Did you, yourself, do anything to compute the force that it takes to separate the base section from the fly section?

A. No, sir, Dr. Scott did it. I watched him reenact that test at our second meeting.

\* \* \* \* \* \*

A. So whatever he did in that report speaks for itself. In our meeting he brought the measuring devices, and I asked him to show me how he measured the horizontal force and came up with that fifteen pounds. And on the subject ladder he replicated what he did quickly. Okay. So that's one thing. And the other thing is, I had him attached this force meter to my foot in a horizontal component mode, and I did a reach up movement without looking at the meter, to ascertain—you know, just a normal reach,

to ascertain what it would feel like. And I was able to get fifteen pounds very easy.

Q. Was any other testing done by you in this case?

A. No.[30]

Under *Daubert*, expert testimony must meet a higher standard than that which previously applied, and cannot consist of conclusory opinions:

The proponent of the evidence must demonstrate to the satisfaction of the court that the proposition offered is based on sound scientific procedures and acceptability of the methodology validating the proposition in question. This standard for evidence requires the proponent of the expert testimony to lay a more extensive foundation than was previously required under the *Frye* rule. The proponent can no longer simply elicit the expert's conclusory testimony, but must elaborate to some extent about the scientific methodology employed to verify the hypothesis—i.e. the tests conducted, the standards employed, and the error rate found.

*Clement v. Griffin*, 634 So.2d 412, 427 (La. App. 4 Cir.1994)

Another court aptly framed the question this way:

Don't we have to have more than just somebody saying, "I am an industrial engineer and I have looked at this ladder, it is the only one I have really looked at for this purpose, but I don't like it, there ought to be something else done to it?" Doesn't there have to be more than that to make out a case of defective design?

*Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir.1993)(quoted from lower court opinion).

---

29. Rec. Doc. 78, Exhibits 2 and 3.

30. Rec. Doc. 64, Exhibit E at pp. 67, 167–27.

*Alevromagiros* involved a products liability action brought against the manufacturer of a ladder for defective design. The plaintiff had been injured when the ladder bent and twisted, causing the plaintiff to fall. The plaintiff's expert testified that the ladder's design was unsafe, but had never examined an undamaged ladder like the one involved in the accident to determine whether its design conformed to the industry standards promulgated by the American National Standards Institute. *Id.* at 419–20. At the close of the evidence, the trial judge directed a verdict against the plaintiff. The Fourth Circuit affirmed.

This case, like *Alevromagiros*, involves experts who have found fault with the design of the ladder in question, but whose opinions are not based upon rigorous scientific testing which meets the *Daubert* standards. This, combined with the experts' lack of experience and training in ladder design, renders the experts' opinions unreliable in this case. Accordingly, the court concludes that the proffered testimony must be excluded from the trial.

### Relevance

Since the proffered experts do not meet the requirements of reliability, an examination of the second prong of the *Daubert* requirement—relevance—is not necessary. However, a brief analysis is included for the sake of completeness.

Under Louisiana law, proof of defective design must comport with the standard set forth in La. R.S. 9:2800.55:

§ 2800.56. **Unreasonably dangerous in design**

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

As noted above, the alternative design suggested by Dr. Scott, and adopted by Dr. George, involves extending the lower guides on the fly section by 3/4″. Dr. Scott also suggested the substitution of rubber end caps on the top end of the fly and the top end of the base section in order to increase the lateral friction force.[31]

▬ It should first be noted that neither Dr. Scott nor Dr. George will testify that the 3/4″ extension of the ladder guide would have prevented plaintiff's accident as required by the quoted statute governing design defect liability. In fact, Dr. Scott admitted that at most, the extension would only serve to increase the amount of force required to separate the guides from 14–15 pounds to 35–38 pounds of force.[32] Dr. Scott further admitted that the longer guides and rubber caps would be a "safer" design but would not be a "safe" design because even with longer guides, separation still occurs when sufficient force is applied to the ladder.[33]

---

31. Rec. Doc. 64, Exhibit B at p. 4.

32. Rec. Doc. 64, Exhibit B, p. 4, ¶ 7–8.

33. Rec. Doc. 64, Exhibit D at p. 186.

Additionally, with respect to application of the *Daubert* factors to this case, Dr. Scott's alternative design has only been tested by Dr. Scott, and it has not been subject to peer review and publication.[34] Of significance is the fact that Dr. Scott did not perform any of the ANSI-required tests on his exemplar ladder. Without such testing, the guide extensions and rubber caps cannot truly be said to be an "alternative design" because alternative designs should meet the same industry standards as the design they are meant to replace.

Because the experts' opinions do not meet the requirements of Louisiana products liability law governing design defects, they are not relevant and must be excluded.

### Conclusion

Considering the foregoing, the court concludes that the testimony of plaintiffs' experts does not meet the necessary *Daubert* standards for relevance or reliability. While both experts have impressive credentials within their respective fields, neither possesses the degree of knowledge, skill, experience, or training to testify about ladder design defects. Accordingly, I find that the experts' opinions concerning alternative design are properly excluded.

**IT IS THEREFORE ORDERED** that defendant's motion in limine to exclude testimony of Dr. Scott and Dr. George is **GRANTED.**

---

**34.** The *Daubert* factors are non-exclusive and not all factors apply to each case. Here only factors 1 and 2 are applicable.