**Daryl and Ann NEWTON Individually and on Behalf of Candis Sofia Newton**

v.

**ROCHE LABORATORIES, INC., et al.**

No. A–00–CA–782 JN.

United States District Court,
W.D. Texas,
Austin Division.

Dec. 5, 2002.

---

Michael T. Gallagher, Gallagher, Lewis & Downey, Scott H. McLemore, Fibich,

Hampton, Leebron & Garth, Houston, for Daryl Newton, Individually and on behalf of Candis Sofia Newton, Ann Newton, Individually and on behalf of Candis Sofia Newton, plaintiffs.

Burgain Garfield Hayes, Jr., Clark, Thomas, & Winters, Austin, Mary Morrissey Sullivan, Colleen M. Hennessey, Sullivan, Sullivan & Nahigian, L.L.P., Boston, MA, Lisa J. Stevenson, Michael X. Imbroscio, Covington & Burling, Washington, DC, Mary R. Pawelek, Clark Thomas & Winters, Austin, Mark H. Lynch, Covington & Burling, Washington, Kenneth J. Ferguson, Clark, Thomas, & Winters, Austin, Gregory Gannon, Gannon, Taliaferro & Biggs, San Antonio, for Roche Laboratories, Inc., Hoffman–Laroche, Inc., Walgreen Company, defendants.

## ORDER

AUSTIN, United States Magistrate Judge.

Before the Court are Defendant's Motion to Exclude the Expert Testimony of Lyle H. Rossiter, Jr., and Motion to Exclude the Expert Testimony of James T. O'Donnell, both documents filed on August 15, 2002 (Clerk's Doc. Nos. 52 & 54). On September 30, 2002, the District Court referred both motions to the undersigned Magistrate Judge for a determination pursuant to 28 U.S.C. § 636(b) and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. On October 15, 2002, the Court held a hearing on the motions, and after considering the oral arguments and submitted briefing, the Court has arrived at its decision in the matter.

## I. BACKGROUND

Plaintiffs Daryl and Ann Newton bring this suit individually and on behalf of their daughter, Candis Sofia Newton. Candis was born in Mexico on April 22, 1982, and placed in an orphanage at eighteen months of age, suffering at the time from severe malnutrition. The Newtons adopted her when she was four-and-a-half years of age.

In December 1998, the Newtons brought Candis to a dermatologist for treatment of severe acne. The doctor prescribed Accutane, and Candis began taking the drug on December 8, 1998. On January 14, 1999, a little over a month later, Candis discontinued her use of Accutane because the Newtons were concerned that the drug was causing psychological problems. Candis continued to exhibit psychotic behavior, and eventually deteriorated to such a point that she required hospitalization in October 2000. She has been diagnosed with severe schizophrenia.

Records indicate that Candis had what Plaintiff's experts agree were predisposing conditions or "risk factors" for schizophrenia. Both her biological uncle and sister have been diagnosed with schizophrenia. While her mother outwardly exhibited symptoms consistent with schizophrenia, she was never clinically evaluated, and has since died. Candis was severely malnourished in her early childhood, and her natural father was sixty years old at the time of her birth (both childhood malnutrition and high paternal age at conception are considered risk factors for mental disease).

Plaintiffs bring this suit claiming that Accutane caused or precipitated the onset of Candis Newton's schizophrenia. They have presented two witnesses to offer expert testimony regarding both general and specific causation, and Defendants move here to exclude this testimony as unqualified and unreliable.

## II. ANALYSIS

A. STANDARD FOR EXCLUSION OF EXPERT TESTIMONY

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact ... a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, (1) if the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case.

In several now well-known cases, the Supreme Court has articulated the trial court's gate-keeping function under Rule 702. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). As a preliminary matter, the trial court is required to determine whether a proposed expert is qualified to give expert testimony. *Kumho Tire Co.,* 526 U.S. at 156, 119 S.Ct. 1167. A party seeking to exclude expert testimony because the expert is not qualified must show that the expert does not possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person. *See McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995).

If the trial court determines that the expert is qualified in the relevant field, then the court must exercise its gate-keeper function as provided in *Daubert* and *Kumho Tire.* In *Daubert,* the Court held that Rule 702 imposes a special obligation upon the trial judge to "ensure that any and all scientific testimony ... is not only relevant but reliable." *Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786. *Daubert* sets forth four specific factors that the trial court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* at 592–93, 113 S.Ct. 2786.

 The *Kumho Tire* Court concluded that a trial court may consider one or more of the specific *Daubert* factors when doing so will help determine that testimony's reliability. *Kumho Tire Co.,* 526 U.S. at 151, 119 S.Ct. 1167. "But, as the Court stated in *Daubert,* the test of reliability is 'flexible,' and the *Daubert* factors neither necessarily nor exclusively apply to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* Thus, whether *Daubert*'s suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. *Id. See also Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir.1999) ("In the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate."). Under *Kumho Tire,* trial courts have broad latitude to determine whether or not the proffered testimony requires an application of the *Daubert* factors.

 In making the reliability determination, the trial court should not require certainty, but the testimony must demonstrate that the opinions offered are more than speculation. In considering this issue, the trial court must consider the validity of the principles applied by the expert, the accuracy of the data relied upon by the expert, and the precision of the application of the principles to the relevant data. *See Marcel v. Placid Oil,* 11 F.3d 563, 567 (5th Cir.1994).

■ The burden of proof on a *Daubert* issue rests on the proponent of the testimony. "The proponent need not prove that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998, en banc). The Fifth Circuit has been particularly careful to distinguish evidence that establishes a *causal relationship* between the product and the alleged injury, from evidence that merely "suggests" an *association* between the product and the injury. *See Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 197 (5th Cir.1996). Although evidence of an association may indicate the need for further research and be important in the scientific and regulatory contexts, the Fifth Circuit has cautioned that tort law requires a "higher standard" of causation. *Id.* at 198. As Judge Posner has noted, "Law lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996). Courts "must resolve cases ... on the basis of scientific knowledge that is currently available," and only evidence that demonstrates a causal relationship between a product and an alleged injury can be admitted as relevant and reliable. *See Moore,* 151 F.3d at 274, 276; *see also Brumley v. Pfizer, Inc.,* 200 F.R.D. 596, 602 (S.D.Tex. 2001) (requiring evidence of causation and noting that "the lack of proof of a drug's safety does not prove that it is dangerous").

## B. Dr. James O'donnell's Testimony

■ Plaintiffs have presented Dr. James O'Donnell as their expert to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia. Defendants attack both Dr. O'Donnell's qualifications and the reliability of his opinions. The Court finds that O'Donnell does not possess the qualifications to render a causation opinion in this case. Although he holds himself out as a "doctor" and a pharmacologist, he has never earned an M.D., a Ph.D., or any degree in pharmacology.[1] *See* Plaintiff's Combined Response to Defendants' Motions to Exclude, Tab B, O'Donnell Dep., pp. 16–21 (hereafter referred to as "O'Donnell Dep."). In fact, his only claim to the title of "doctor" is based upon the completion of a one-year "Pharm.D."[2] program in 1971. *Id.* at 16. O'Donnell admits that he took just one course related to pharmacology during his year-long Pharm.D. program.[3] *Id.* at 20. Although he is listed as an Assistant Professor of Pharmacology at the Rush Medical College, he offers only a single class there as an unpaid, volunteer lecturer, spending roughly a half-day a week in connection with the job. *Id.* at 15.

1. Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs.

2. Although O'Donnell apparently grants himself the title of "doctor" in reliance upon his Pharm.D. degree, he conceded in his deposition that in the majority of pharmacy schools, the Pharm.D. degree is "an entry-level degree" that pharmacists must have to even practice pharmacy. *See* O'Donnell Dep. at 18.

3. To be clear, the one-year Pharm.D. program that O'Donnell completed in 1971 was a degree in pharmacy, not pharmacology. Notably, O'Donnell admitted in his deposition that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business. *See* O'Donnell Dep. at 21–22. He was eventually sued by a plaintiff that he testified for in 1987, and he paid money to settle the case. *Id.* at 22. He no longer advertises himself as having a doctorate in pharmacology although he continues to use the title "doctor" and to consider himself a pharmacologist.

The class is entitled "New Drug Development and Regulation," and can hardly be described as primarily scientific or pharmacological in nature. *Id.* Moreover, he has no expertise in what causes psychosis, including schizophrenia, or in any field of science relevant to plaintiffs' claims (such as psychiatry, psychology, dermatology, neurology, biology, biochemistry, or epidemiology). *Id.* at 24–27.

■ Not only does O'Donnell lack appropriate pharmacological training relevant to the issues in this case, he concedes that he has not performed even basic "bench or clinical research" on Vitamin A or Accutane.[4] *Id.* at 42–43. He has conducted no serious scientific research independent of this litigation. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."). Instead, O'Donnell's opinion in this case is based solely on an incomplete review of existing literature (mainly limited to anecdotal case reports), certain FDA documents, and a small subset of the spontaneous adverse event reports produced in an earlier litigation.[5] *See* O'Donnell Dep.

at 66–67, 103–04. As one Court of Appeals has put it, an individual's "review of literature" in an area outside his field does "not make him any more qualified to testify as an expert … than a lay person who read the same articles." *United States v. Paul,* 175 F.3d 906, 912 (11th Cir.1999).

■ In summary, O'Donnell has no relevant expertise regarding Accutane, Vitamin A, schizophrenia, or psychosis outside of that which he has gleaned from a scant literature review for the purpose of consulting and testifying in this case. He possesses no special knowledge, skill, experience, training, or education that would qualify him to render an expert opinion on general causation in this case. In fact, in describing O'Donnell's experience relevant to his opinions here, Plaintiff's counsel stated:

> He has been a pharmacist for twenty-eight years, and he's also been a—he *holds himself out* as a pharmacologist. He's done a number of—he has done research in pharmacology.[6] He does not hold a Ph.D. in that, but he *holds himself out* as that …

Transcript of October 15, 2002 *Daubert* Hearing, at 155 (Clerk's Doc. No. 76) (emphasis added) (hereafter "Hearing Tr."). Removing the doublespeak, what Plaintiffs' counsel is saying here is that O'Donnell is not a pharmacologist at all, but has somehow managed to "hold himself out" as one.

---

4. Both Vitamin A and Accutane are retinoids, and research on retinoids is therefore potentially relevant to the causation issue in this case.

5. O'Donnell concedes that he did not look at any adverse event reports in connection with this case. *See* O'Donnell Dep. at 104. Furthermore, the few adverse event reports that he did review in relation to the earlier case dealt with depression, not psychosis or schizophrenia. *Id.*

6. Notwithstanding Plaintiffs' counsel's claim, there is no evidence that O'Donnell has ever

done what would be considered to be scientific research in the area of pharmacology. Further, if by this Plaintiffs' counsel means that O'Donnell has read and studied the scientific literature in the area of pharmacology, even that is questionable, at least in the area involved in this case, insofar as O'Donnell was not familiar with the "hundreds or thousands" of published scientific studies involving Accutane, retinoids, and Vitamin A. *See* O'Donnell Dep. at 123–24; *see also* Hearing Tr. at 24–26.

In fact, rather than fitting the mold of a pharmacologist who is scientific in his approach, he much more closely fits the profile of an "expert for hire" whose opinions are more likely to be biased.[7] As *Daubert* explains, the Court has a "gatekeeping" responsibility that requires it to prevent such individuals from giving unqualified scientific opinions to juries. Here, the Court cannot in good conscience present James O'Donnell to a jury as an expert in the effects of Accutane on the human body. Quite frankly, the Court finds Plaintiff's attempts to present O'Donnell as an expert pharmacologist to be an extremely bold stretch.

Although the Court's decision that O'Donnell is not qualified to render an opinion on general causation in this case is enough to grant the motion to exclude his testimony, the Court will also briefly discuss the reliability of O'Donnell's testimony.

■ O'Donnell's first contention is that Accutane is "an analog of Vitamin A" and, therefore, it will "share many of the side-effects experienced with Vitamin A." *See* Defendants' Motion to Exclude Expert Testimony, O'Donnell Rep., Ex. 12 at 4 (hereafter referred to as "O'Donnell Rep."). In his report, O'Donnell lists the "typical" side effects he believes result from ingesting too much Vitamin A, including "acute schizophrenia or remitting psychosis." *Id.* at 4–5. For this opinion to be admissible, O'Donnell must have a reliable scientific basis to support not only (1) a causal relationship between Vitamin A and psychiatric side-effects, but also (2) his assertion that Accutane will also produce these side-effects. He has shown neither.

■ The only support O'Donnell cites for his opinion that ingestion of large doses of Vitamin A causes "acute schizophrenia and remitting psychosis" comes in the form of isolated anecdotal case reports, including an Arctic explorer's journal from the mid-nineteenth century. He admittedly relies on no epidemiological or clinical studies. *See* O'Donnell Dep. at 66. In the October 15, 2002 *Daubert* hearing, Defendants' testifying expert, Dr. Lorraine Gudas,[8] found O'Donnell's research to be "shockingly unscientific" because, in manufacturing his report, he ignored "hundreds of [sic][9] thousands of peer-reviewed articles" that demonstrate "no link between Vitamin A and schizophrenia." *See* Hearing Tr. at 25–26. In Dr. Gudas' opinion, O'Donnell's reliance on such arcane and isolated case reports (much of which was

---

**7.** O'Donnell apparently does plenty of consulting and testifying as an expert witness. In fact, by his own account, O'Donnell earned approximately $750,000 from his expert consulting work last year alone. *Id.* at 33.

**8.** Unlike Mr. O'Donnell, Dr. Gudas is clearly qualified to render an expert opinion in this case. She earned a Ph.D. in biochemistry from Princeton University, and was a tenured full professor in the pharmacology department at Harvard Medical School by 1991. Following that, she was recruited to her current position as chairman of the pharmacology department at Cornell University. Her students include those acquiring an M.D., as well as those obtaining their Ph.D. degrees in pharmacology. Her research has been funded by the National Institutes of Health contin-

uously for the last twenty years. She has been elected to the board of directors of the American Association of Cancer Research, and her laboratory has produced approximately 135 publications for peer-reviewed scientific research journals. The focus of her research is the molecular action of Vitamin A and other retinoids, and she is also knowledgeable about the drug Accutane. In notable contrast to O'Donnell's full-time occupation as a testifying expert-for-hire, the one and only time Dr. Gudas has testified at a trial was in April of this year in regard to the pharmacology of Accutane. *See* Transcript of October 15, 2002 *Daubert* Hearing, pp. 16–17, 22.

**9.** The statement at the hearing was "hundreds *or* thousands."

taken from a nineteenth century Arctic explorer's journal), coupled with his neglect of such a plethora of available scientific literature, rendered his report "well below" the "standards of scientific validity." *Id.* at 26. She testified that there is simply no scientific basis in the existing literature for O'Donnell's contention that large doses of Vitamin A are known to cause schizophrenia and psychosis. *Id.* at 24–25.

Even if O'Donnell were able to point to reliable evidence that Vitamin A taken in large doses could cause psychosis, he would also have to show that Accutane acts in the same way. He claims that because Vitamin A and Accutane are chemically similar, one can assume that they will have similar effects on the body, although he concedes that he nor anyone else has ever tested this assumption. *See* O'Donnell Dep. at 135–36. Defendants point out that in *Moore* the Fifth Circuit rejected the plaintiff's expert's claims that because two chemicals were similar and one was known to cause Reactive Airways Dysfunction Syndrome (RADS), it could be assumed that the other would cause RADS as well. *See Moore,* 151 F.3d at 278. Here, important chemical differences exist between the two: Vitamin A is an alcohol, and Accutane is an acid. *See* O'Donnell Dep. at 126. O'Donnell admitted further that the human body reacts to Accutane and Vitamin A in different ways. *Id.* at 124–26. Dr. Gudas testified at the hearing that Vitamin A is able to bond with acids, and is stored in the liver (as retinol palmitate), while Accutane cannot bond with acids, and as a result is excreted rapidly from the body. Hearing Tr. at 23. Further, O'Donnell

conceded that despite their chemical similarity, there are in fact pharmacological differences "as well as pharmacokinetic differences" between Accutane and Vitamin A. *Id.* at 126–27. Furthermore, Dr. Gudas also stated unequivocally that "[p]sychosis is not a known side effect of Accutane." *Id.* at 26. As she explained, O'Donnell failed to even acknowledge many recent studies—including double-blind, placebo-controlled studies [10]—in which doses of Accutane were administered over long periods of time to cancer patients. *Id.* at 28. None of these studies showed that there is "any biological plausibility" to O'Donnell's opinion that Accutane can cause psychosis or schizophrenia. *Id.* And with regard to O'Donnell's continued reliance on the journal of an Arctic explorer, Dr. Gudas told the Court:

"I think that talking about explorer's journals from 1850 is not science. I am sorry, but we have done science for the last fifty years in this country that—where patients have been given high doses of Vitamin A and psychosis and schizophrenia have not been reported, so I think it's completely irrelevant and unscientific to even be wasting time talking about this old polar bear stuff."

*Id.* at 42. The Court agrees.

In conclusion, it is clear that instead of relying on acceptable scientific foundations, O'Donnell bases his opinion on isolated, anecdotal case reports, many of which were from a nineteenth century Arctic explorer's journal, and most of which dealt with depression and not schizophrenia. The Fifth Circuit and many other courts have soundly rejected case reports as an acceptable basis for causation.[11] Not

---

**10.** Double-blind studies are considered the "gold standard" for scientific research. *See* Hearing Tr. at 27.

**11.** *See, e.g., Black,* 171 F.3d at 313 & n. 2 (approving conclusion that case reports do not provide causation evidence); *Caraker v.*

*Sandoz Pharms. Corp.,* 172 F.Supp.2d 1046, 1050 (S.D.Ill.2001) (rejecting experts' opinions relying on case reports); *Siharath v. Sandoz Pharms. Corp.,* 131 F.Supp.2d 1347, 1361 (N.D.Ga.2001) (case reports "cannot establish general causation"), *aff'd sub nom., Rider v. Sandoz Pharms. Corp.,* 295 F.3d

only was the "research" he did do unreliable, O'Donnell plainly ignored a voluminous and directly relevant group of scientific studies on Vitamin A and Accutane which dramatically undermine his claim that either could be said to cause psychosis in general or schizophrenia in particular. O'Donnell fails the *Daubert* reliability criteria in virtually every regard. There is no evidence that any of O'Donnell's theories have been tested; plaintiffs can produce no peer-reviewed, published, scientific articles concluding that Accutane causes psychosis or that Accutane and Vitamin A will have similar effects; there is certainly not general acceptance in the scientific community of O'Donnell's theories (as Dr. Gudas testified and O'Donnell conceded in deposition);[12] moreover, O'Donnell is a professional witness who has demonstrated little, if any, non-litigation basis for his opinion.

In light of his lack of qualification and the unreliability of his testimony, the Court finds that Defendants' Motion to Exclude the Expert Testimony of James T. O'Donnell (Clerk's Doc. No. 54) should be GRANTED.

## C. Dr. Lyle Rossiter's Testimony

Defendants have also submitted a motion to exclude the testimony of Dr. Lyle Rossiter, who Plaintiffs have presented to testify as to specific causation, *i.e.*, that Accutane was the cause in fact of Candis Newton's schizophrenia. Defendants' first contention against Dr. Rossiter's testimony is that he is unqualified to render a specific causation opinion in this case. Defendants argue that he has no "specialized knowledge" about any of the fields that would provide guidance to a jury in this case, particularly with regard to Accutane. Dr. Rossiter has admittedly never performed any clinical research on the effects of Accutane, nor has he ever testified about the cause of a particular patient's schizophrenia.[13] Because the dispute in this case involves the question of whether Candis Newton's schizophrenia was caused by Accutane, Defendants argue that Dr. Rossiter lacks the particular expertise that would be relevant to this case.

However, as Plaintiffs point out, since Dr. Rossiter is not a dermatologist, it is not surprising that he would never have prescribed a drug like Accutane. Furthermore, he has testified to his expertise as a clinical psychiatrist in the area of neuropharmacology for the purpose of evaluating psychotropic drugs. The Court finds that this is sufficient to establish Dr. Rossiter's qualifications as an expert witness in this case.

Dr. Rossiter's opinion in this matter is that Accutane more likely than not played at least a precipitating role in the

---

1194 (11th Cir.2002); *Castellow v. Chevron USA*, 97 F.Supp.2d 780, 787 (S.D.Tex.2000) (agreeing that "attempts to form opinions regarding medical causation based on documents such as [anecdotal case reports or collections of case reports] are unscientific and speculative" (amendments in original; citation omitted)); *In re Breast Implant Litig.*, 11 F.Supp.2d 1217, 1231 (D.Colo.1998) (noting that case reports "do not isolate and exclude potentially alternative causes ... and do not investigate or explain the mechanism of causation" (citation omitted)); *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1411 (D.Or.1996) ("case reports and case studies are universally regarded as an insufficient scientific basis for a conclusion regarding causation because case reports lack controls") (citations omitted). Even O'Donnell himself concedes that case reports "are notoriously subject to bias." *See* O'Donnell Dep. at 112.

12. *See* O'Donnell Dep. at 52, 174–75.

13. Dr. Rossiter has provided expert testimony in roughly 2500 cases, and since the end of 1998, he has derived 95% of his income from legal consulting. His annual income in 2001 was approximately $300,000.

emergence of Candis Newton's schizophrenia. *See* Plaintiff's Combined Response to Defendants' Motions to Exclude, Tab D, Rossiter Report at 7 (hereafter referred to as "Rossiter Rep."). Conceding that there is an absence of controlled studies showing that Accutane causes psychosis, he bases his opinion on two things: (1) the temporal association between Candis Newton's Accutane use and her illness; and (2) the Physician's Desk Reference and package insert warnings supplied by Roche Labs.[14] *Id.* at 6–7. In his words:

> The argument that Accutane contributed nothing to Candice's [sic] psychosis implies that her use of that drug and the onset of her illness were mere coincidence, that she would have developed her illness anyway, and that a drug which the PDR warns in bold type may cause psychosis played no causal role. In my opinion this would be a very difficult argument to make . . . .

*Id.* at 6. Accordingly, Dr. Rossiter claims that the PDR warning combined with the coincidence of Candis Newton's illness and her ingestion of Accutane compels him to conclude that Accutane must have "served as some type of biochemical insult" to Candis Newton's brain that resulted in her current psychotic symptoms.

■ The Court finds this opinion inadmissible because Dr. Rossiter had no reliable basis for it. To establish specific causation (that a product was the cause-in-fact of plaintiff's injury), an expert must demonstrate a "specific train of medical evidence" connecting the illness to the product. *Black,* 171 F.3d at 314. In his attempt to provide this "specific train of medical evidence," Dr. Rossiter admits that he is unable to rely upon any controlled studies showing that Accutane causes psychosis. *See* Rossiter Rep. at 6. In fact, he readily agreed that it is not generally accepted in the medical community either that Accutane serves as a "biochemical insult" to the brain or that Accutane causes or aggravates schizophrenia. *See* Rossiter Dep. at 111–12. Furthermore, Dr. Rossiter admits that one of the primary bases for his opinion was his reliance on James O'Donnell's December 5, 2000 presentation on Accutane to the U.S. House of Representatives. *See* Rossiter Rep. at 1. As the Court explained *supra,* O'Donnell's opinion on Accutane's relationship to psychosis is entirely untenable. Clearly, the reliability of Dr. Rossiter's

14. Although these are the only two grounds that Dr. Rossiter himself cites in support of his opinion, Plaintiffs attempt to add another ground in their brief to the Court: "an evaluation of the available literature." *See* Plaintiffs' Combined Response at 15 (Clerk's Doc. No. 59). They apparently do so to align with the standard set forth in the only case they cite in this section of their brief, *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873 (W.D.Tex.1997). *Kelley* states that a "broad review of the medical literature," combined with experience and a medical review, can satisfy the *Daubert* standard. *Id.* at 883. However, Dr. Rossiter himself admits that he did not conduct a "broad review of the medical literature." He testified to just the opposite:

> Q. Did you conduct a literature search with respect to the issue of Accutane and

> psychosis prior to forming your opinion in this case?
>
> A. I did not.
>
> Q. Did you review any literature with respect to this issue prior to forming your opinion in this case?
>
> A. No.
>
> Well, only the PDR and some of the materials sent to me by Mr. Serafin [one of the Plaintiffs' attorneys] regarding Accutane and those articles alleging some sort of psychoactive influence from Accutane.

Rossiter Dep. at 75–76. In light of the above, it is not surprising that Dr. Rossiter did not claim to have based his opinion on a "broad review of the medical literature," and Plaintiffs certainly have no basis for attempting to make that claim for him now.

testimony is significantly undermined by his reliance upon O'Donnell's opinion.

▇▇▇ As stated earlier, Dr. Rossiter claims to rely on two things to conclude that Candis Newton's schizophrenia was induced by her use of Accutane: (1) the temporal association between Candis' Accutane use and her illness; and (2) the Physician's Desk Reference and package insert warnings supplied by Roche Labs. *See* Rossiter Rep. at 7. Neither of these bases is sufficiently reliable. As Defendants point out, the Fifth Circuit has rejected expert testimony that relies "substantially on the temporal proximity between exposure and symptoms." *Moore,* 151 F.3d at 278; *see also Black,* 171 F.3d at 313 (rejecting reliance on temporal proximity as "not an exercise in scientific logic but in the fallacy of *post-hoc propter-hoc* reasoning, which is as unacceptable in science as in law"); *Lassiegne,* 202 F.Supp.2d at 517 (rejecting opinion based on "temporal proximity alone" as "present[ing] no scientific basis for [the] ultimate conclusion"). Defendant contends further that the warning label should not be considered a "reliable" source for Dr. Rossiter's opinion. FDA-approved warnings to physicians generally are not evidence of causation. Indeed, the FDA regulations on warnings provide that "a causal relationship need not have been proved" before warnings are added to drug labels. 21 C.F.R. § 201.57(e) (2002); *see also Allen,* 102 F.3d at 198 (a regulatory agency's "threshold of proof is reasonably lower than that appropriate in tort law, which 'traditionally makes more particularized inquiries into cause and effect'"); *Nelson v. American Home Prods. Corp.,* 92 F.Supp.2d 954, 969 (W.D.Mo.2000) ("The FDA warning, therefore, cannot be relied upon as evidence of causation.").

▇▇▇ Not only are these two specific grounds that Dr. Rossiter relies upon for his opinion unreliable, his testimony is also unreliable because it fails to adequately take into account alternative explanations for Candis's schizophrenia, such as her pre-Accutane behavior combined with her background and family history. Another step in establishing specific causation is for the expert to demonstrate that the product was more likely to have caused a plaintiff's injuries than any other potential cause. *See, e.g., Alcan Aluminum Corp. v. BASF Corp.,* 133 F.Supp.2d 482, 494 & n. 6 (N.D.Tex.2001). Dr. Rossiter's conclusion that Accutane induced Candis's schizophrenia relies solely on the temporal proximity of her illness and her taking of the drug. However, he does not adequately consider that Candis's uncle and sister were schizophrenic and her mother outwardly exhibited symptoms consistent with schizophrenia; Candis was severely malnourished in her early childhood; and Candis's natural father was sixty years old at the time of her birth—all of which Dr. Rossiter agrees are considered risk factors for the natural onset of schizophrenia. Dr. Rossiter's reaction to this evidence was only that Accutane could also be a possible contributing cause. *See* Rossiter Tr., Ex. 15 p. 87–88. Because Dr. Rossiter cannot assert that Accutane is any more likely to have caused Candis's schizophrenia than natural onset causes, his theory "amounts to speculation and will be of no assistance to the jury." *Sittig v. Louisville Ladder Group, LLC,* 136 F.Supp.2d 610, 617 (W.D.La.2001) ("Without some scientific basis to establish that ladder separation was the most likely cause of Mr. Sittig's fall, the proffered expert testimony amounts to speculation and will be of no assistance to the jury."); *see also Allen,* 102 F.3d at 197 (with regard to expert testimony, plaintiff must be able to show that it is "more likely than not" that defen-

dant has caused them harm) (citation omitted); *Mays v. State Farm Lloyds*, 98 F.Supp.2d 785, 787 (N.D.Tex.2000) (rejecting expert testimony that did not "assert that [the proposed theory] is the more likely explanation or why").

Due to the unreliability of Dr. Rossiter's testimony, the Court finds that Defendants' Motion to Exclude the Expert Testimony of Lyle H. Rossiter, Jr. (Clerk's Doc. No. 52) is hereby GRANTED.

### III. CONCLUSION

The Court finds that the proffered testimony of both James O'Donnell and Lyle Rossiter should be excluded. Both use unreliable methodology in arriving at their opinions in this case. As such, the Court finds that Defendants' Motion to Exclude the Expert Testimony of James T. O'Donnell (Clerk's Doc. No. 54), and Motion to Exclude the Expert Testimony of Lyle H. Rossiter, Jr. (Clerk's Doc. No. 52) should both be GRANTED.